# United States Court of Appeals
# For the Second Circuit

---

August Term 2024
Argued: October 18, 2024
Decided: August 13, 2025

No. 24-725-cv(L), 24-728-cv(CON)

---

A.H., by her next friend E.H., R.D., by her next friend M.D., J.D., by his next friend D.D., H.L., on behalf of themselves and all others similarly situated, A.B., on behalf of themselves and all others similarly situated, J.S., on behalf of themselves and all others similarly situated, J.C.M., on behalf of themselves and all others similarly situated, L.P., by her next friend C.P., DISABILITY RIGHTS NEW YORK,

*Plaintiffs-Appellants,*

E.B., M.W., by his next friend T.D., J.D.C., J.P.S., by his next friend S.S., M.F., O.A., M.Y., by his next friend B.L., C.H.,

*Intervenor-Plaintiffs-Appellants,*

*v.*

NEW YORK STATE DEPARTMENT OF HEALTH, JAMES V.
MCDONALD, in his official capacity as Commissioner
of the New York State Department of Health, NEW
YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL
DISABILITIES, WILLOW BAER, in her official capacity as
Commissioner of the New York State Office for People
With Developmental Disabilities

*Defendants-Appellees.**

---

Appeal from the United States District Court
for the Southern District of New York
No. 22-cv-5045
Mary Kay Vyskocil, *Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Before:        PARK, LEE, and PÉREZ, *Circuit Judges*.

Plaintiffs in this case are an organization called Disability Rights New York ("DRNY") and eight individuals with developmental disabilities ("Individual Plaintiffs") who allege long delays in moving from restrictive institutional facilities to community-based residential settings.  Plaintiffs sued various New York State defendants under the Medicaid Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Fourteenth Amendment.  Defendants moved to dismiss DRNY's claims for lack of standing.  They also argued later in a pre-motion letter that the Individual Plaintiffs' claims were moot because they had since been moved out of institutional facilities.  The district court (Vyskocil, *J.*) dismissed both DRNY's and the Individual Plaintiffs' claims and also denied a motion to intervene by additional proposed plaintiffs. Plaintiffs challenge all three rulings on appeal.  We conclude that the district court correctly dismissed DRNY's claims for lack of standing because DRNY suffered no injury in fact, and we reject its theory of "congressionally authorized representational standing."  But the district court erred in dismissing the Individual Plaintiffs' claims as moot based solely on pre-motion letters.  Finally, the district court did not abuse its discretion by denying the motion to intervene.  We thus **AFFIRM** in part, **VACATE** in part, and **REMAND**.

Judge Pérez dissents from Section II.A in a separate opinion and otherwise concurs in the judgment of the Court.

————

ANDREW W. BRELAND, David J. Abrams, Stephen P. Thomasch, Yarden N. Hodes, Kasowitz Benson Torres

3

LLP, New York, NY, *for Individual Appellants and Intervenor-Plaintiffs-Appellants*.

JENNIFER J. MONTHIE, Julie Keegan, Ben Taylor, Disability Rights New York, Brooklyn, NY, *for Appellant DRNY*.

CLELAND B. WELTON II, Assistant Solicitor General; Matthew W. Grieco, Senior Assistant Solicitor General; Barbara D. Underwood, Solicitor General, *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees*.

————

PARK, *Circuit Judge*:

Plaintiffs in this case are an organization called Disability Rights New York ("DRNY") and eight individuals with developmental disabilities ("Individual Plaintiffs") who allege long delays in moving from restrictive institutional facilities to community-based residential settings. Plaintiffs sued various New York State defendants under the Medicaid Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Fourteenth Amendment. Defendants moved to dismiss DRNY's claims for lack of standing. They also argued later in a pre-motion letter that the Individual Plaintiffs' claims were moot because they had since been moved out of institutional facilities. The district court dismissed both DRNY's and the Individual Plaintiffs' claims and also denied a motion to intervene by additional proposed plaintiffs. Plaintiffs challenge all three rulings on appeal. We conclude that the district court correctly dismissed DRNY's claims for lack of standing because

4

DRNY suffered no injury in fact, and we reject its theory of "congressionally authorized representational standing." But the district court erred in dismissing the Individual Plaintiffs' claims as moot based solely on pre-motion letters. Finally, the district court did not abuse its discretion by denying the motion to intervene. We thus affirm in part, vacate in part, and remand.

## I. BACKGROUND

A. <u>Factual Background</u>

The New York State Office for People with Developmental Disabilities ("OPWDD") coordinates services for New Yorkers with developmental disabilities, including cerebral palsy, Down syndrome, autism spectrum disorders, and other neurological impairments. Part of OPWDD's work is to administer Medicaid's Home and Community Based Services ("HCBS") Waiver Program, which provides services for disabled people in residential facilities. OPWDD licenses or operates over 34,000 certified community residence beds in New York.

OPWDD determines whether an individual is eligible for the HCBS Waiver Program. To qualify, the individual must (1) be diagnosed with a developmental disability; (2) be eligible for placement in an Intermediate Care Facility ("ICF"); (3) be enrolled or eligible for enrollment in Medicaid; (4) exercise freedom of choice between receipt of waiver services or placement in an ICF; (5) reside in an appropriate living arrangement at the time of enrollment (*e.g.*, in a relative's home and not an ICF); and (6) have demonstrated a need for waiver services. 14 N.Y. Comp. Codes R. & Regs. § 635-

5

10.3(b).  OPWDD then considers an individual's particular needs and the availability of suitable residential opportunities.

The eight Individual Plaintiffs here have developmental disabilities and were deemed eligible by OPWDD for placement in community-based settings.  They allege, however, that they remained institutionalized.  As of October 2022, the Individual Plaintiffs claim to have waited from nine months to six years for placement in community-based residences.  They allege that this prolonged institutionalization caused them to suffer physical and psychological regression.

Plaintiff DRNY is an organization that advocates for the rights of New Yorkers with developmental disabilities.  It is a Protection and Advocacy System authorized under federal law to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights" of individuals with developmental disabilities.  42 U.S.C. § 15043(a)(2)(A)(i).

Defendants are OPWDD, the New York State Department of Health ("DOH"), and their respective commissioners, Willow Baer and James V. McDonald.

B.    Procedural History

On June 16, 2022, Plaintiffs filed suit, bringing claims under the Medicaid Act, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.  They sought injunctive and declaratory relief on behalf of themselves and a purported class of similarly situated "[i]ndividuals who have been, or will be, determined by OPWDD to be eligible for HCBS Waiver services and certified residential

6

opportunities, but remain institutionalized due to Defendants' failure to deliver these services." Joint App'x at 62. Several months later, Plaintiffs filed an amended complaint removing two plaintiffs, adding two new ones, and adding a due process claim under 42 U.S.C. § 1983.

On December 1, 2022, Defendants filed a partial motion to dismiss DRNY's claims for lack of standing. On July 5, 2023, eight additional institutionalized individuals moved to intervene as named plaintiffs.

While both the motion to dismiss and the motion to intervene were pending, Defendants submitted a letter to the district court requesting a pre-motion conference in anticipation of filing another partial motion to dismiss the Amended Complaint under Rule 12(b)(1). Defendants argued that the court lacked subject-matter jurisdiction because the claims of all eight Individual Plaintiffs were moot. Plaintiffs filed a letter responding that DRNY and the Individual Plaintiffs had standing and the case was not moot.

On February 20, 2024, without further briefing or a hearing, the district court issued a written opinion dismissing the action and denying the motion to intervene.

## II. DISCUSSION

Plaintiffs argue that the district court (1) erred in dismissing DRNY's claims for lack of standing; (2) erred in dismissing the Individual Plaintiffs' claims as moot based on pre-motion letters; and (3) abused its discretion in denying the motion of additional proposed plaintiffs to intervene.

7

A.   Standing

DRNY claims to have "congressionally authorized representational standing."  DRNY Br. at 16.  It argues that Congress "unequivocally bestowed representational standing" on DRNY to sue in its own name on behalf of individuals with disabilities under the Developmental Disabilities Assistance and Bill of Rights Act of 1975 and the Protection and Advocacy System for Individuals with Mental Illness Act.  *Id.* at 2, 10.  Supreme Court precedent forecloses this argument.

1.   *Legal Standards*

"On appeal from a district court's dismissal for lack of subject-matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*."  *Avon Nursing & Rehab. v. Becerra*, 995 F.3d 305, 310-11 (2d Cir. 2021) (quotation marks omitted).  That includes "questions of standing."  *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021).

The federal judicial power extends only to the resolution of "Cases" and "Controversies."  U.S. Const. art. III, § 2.  "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotation marks omitted).

To establish standing, a plaintiff must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

8

An organization "may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).[1]

2. *Application*

a. DRNY's Theory of Standing

DRNY argues that it has standing because Congress granted it the authority to "stand in the shoes" of individuals with disabilities. DRNY Br. at 7. Under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), states accepting federal funds to provide services for individuals with developmental disabilities are required to have "a system to protect and advocate the rights of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(1).

---

[1] In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court articulated a three-part test for associational standing. 432 U.S. 333, 343 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* The Court also stated that an organization need not have "members" in the "traditional . . . sense"; it is sufficient to have a "constituency" with "the indicia of membership in an organization." *Id.* at 344. We have thus "recognized that—assuming the other criteria for associational standing are met—non-membership organizations may sue in a representative capacity when they function effectively as a membership organization." *Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012) (cleaned up).

Those Protection and Advocacy ("P&A") Systems are vested with the "authority" to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals." *Id*. § 15043(a)(2)(A)-(A)(i). That includes "bringing a suit on behalf of individuals with developmental disabilities against a State, or an agency or instrumentality of a State." *Id*. § 15044(b)(1).

Like the DD Act, the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act") empowers P&A Systems to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness" and "the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. §§ 10805(a)(1)(B), 10801(b)(2)(A). The PAIMI Act also gives P&A Systems the authority to "pursue administrative, legal, and other remedies on behalf of an individual." *Id*. § 10805(a)(1)(C).

The federal regulations implementing the PAIMI Act permit allotments to "be used to pay the otherwise allowable costs incurred by a P&A system in bringing lawsuits in its own right to redress incidents of abuse or neglect, discrimination, and other rights violations impacting on individuals with mental illness." 42 C.F.R. § 51.6(f).

DRNY, a not-for-profit corporation, was "designated as New York State's P&A System and Client Assistance Program on June 1, 2013." DRNY Br. at 2 (citing N.Y. Exec. Law § 558(b)). As the P&A System for New York, DRNY receives "eight federal grants that require [it] to protect and advance the rights of individuals with disabilities." *Id.*

10

DRNY thus argues that Congress has bestowed "representational standing" on it as a P&A System under the plain language of the governing statutes and regulations. In other words, because Congress has specifically authorized DRNY to bring suit in its own name on behalf of people with disabilities, it maintains that it has satisfied the constitutional requirements for standing.

b.      Discussion

DRNY does not claim to have direct standing and it expressly disclaims reliance on associational standing.[2] It also does not argue that it is the "next friend" of the Individual Plaintiffs.[3] And its novel theory of "congressionally authorized representational standing" is squarely foreclosed by Supreme Court precedent.

---

[2] DRNY does not argue that it has associational standing, so we do not reach that issue here. But to the extent that DRNY brings claims under 42 U.S.C. § 1983, "[i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011); *see also Conn. Citizens Def. League*, 6 F.4th at 447 (holding that an organization lacked standing to pursue a preliminary injunction because it "brought this case under 42 U.S.C. § 1983"); *Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1973).

[3] Such an argument is thus forfeited. In any event, the Individual Plaintiffs do not assert that they are unable to "appear on [their] own behalf to prosecute the action." *Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990). To the contrary, several of them assert claims on behalf of themselves and all others similarly situated. Moreover, those who do not assert their own claims already appear through a next friend. The concurrence's suggestion that Congress could bestow next-friend status on DRNY is thus not only incorrect, but irrelevant. *See post* at 25-26.

11

"Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). Congressional authorization by statute "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *TransUnion*, 594 U.S. at 426. There is an "important difference" between "a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law" and "a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426-27. Concluding that "Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law" would "flout constitutional text, history, and precedent," "violate Article III," and "infringe on the Executive Branch's Article II authority." *Id.* at 428-29.[4]

DRNY argues that the Supreme Court has "unequivocally held that representational standing can exist based on particular relationships authorized by Congress." DRNY Br. at 8 (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544,

---

[4] The concurrence asserts that the "text, context, and history of DRNY's authorizing statutes make plain that Congress intended to authorize DRNY to assert representational standing." *Post* at 33. But that is beside the point because Congress cannot grant Article III standing. In any case, it is not clear that Congress intended for a P&A System to sue in a representative capacity. The DD Act states only that a P&A System can bring "suit on behalf of individuals with developmental disabilities." 42 U.S.C. § 15044(b)(1). That is consistent with a P&A System's ability to bring claims as a legal advocate for its constituents, and it does not necessarily authorize the System to act as a representational plaintiff.

12

557 (1996)).  But *United Food* did not create a new species of standing; it addressed a question of associational standing—*i.e.*, "whether Congress has the constitutional authority to alter the third prong of the associational standing enquiry" under *Hunt v. Washington State Apple Advertising Commission*.  *See United Food*, 517 U.S. at 548.  The Court held that while the first two prongs of the *Hunt* test are "constitutional and absolute" in nature, the third—whether the asserted claim or requested relief requires individual member participation—is "prudential and malleable by Congress."  *Id.* at 551.  So a union had associational standing to sue on behalf of its members under the Worker Adjustment and Retraining Notification Act when the union had already established that its "members would have had standing to sue on their own (the first prong)" and "that the interests the union sought to protect were germane to its purpose (the second prong)."  *Id.* at 553.

DRNY also contends that Congress may constitutionally delegate authority to a private entity, as it does to governmental agencies.  This too is misguided.

As an example, DRNY points to the fact that the General Counsel of the Equal Employment Opportunity Commission ("EEOC") is authorized to conduct litigation on behalf of the EEOC.  And the concurrence similarly suggests that DRNY has "statutory representational standing" analogous to the EEOC's litigation authority when it "seek[s] back pay on behalf of victims."  *Post* at 28.  But the General Counsel of the EEOC is an Officer of the United States, who is appointed by the President and confirmed by the Senate.  *See* 42 U.S.C. § 2000e-4(b)(1).  DRNY, by contrast, is a private

13

organization whose employees are not democratically accountable public officials.[5] DRNY's reliance on federal agency analogs is misplaced.

In limited circumstances, the Supreme Court has acknowledged the "right of litigants to bring actions on behalf of third parties." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991). But even in such instances, the litigant "must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome." *Id.* at 411 (quotation marks omitted). DRNY alleges no such injury. Moreover, the Supreme Court has cautioned that a nominal agency relationship between a principal and purported agent is insufficient to satisfy Article III, because "[a]gency requires more than mere authorization to assert a particular interest." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013). Here, concluding that DRNY has standing based on its theory of "congressionally authorized representational standing" would issue a "private part[y] who otherwise lack[s] standing a ticket to the federal courthouse." *Id.* at 715. Congress

---

[5] And unlike the Federal Trade Commission, Congress did not authorize DRNY to "commence, defend, or intervene in, and supervise . . . litigation . . . in its own name by any of its attorneys." 15 U.S.C. § 56(a)(1)(B). Congress's grant of authority to P&A Systems to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" individuals with disabilities does not convey the same standing as federal agencies that can assert the sovereign's injuries and rights. 42 U.S.C. § 15043(a)(2)(A)(i).

cannot legislate away Article III's injury-in-fact requirement by conferring statutory representative status on a private party.[6]

B.      Mootness

The Individual Plaintiffs argue that the district court erred in dismissing their claims on mootness grounds based on pre-motion letters. We agree. District courts generally should not dismiss a case without providing the opportunity to be heard unless a jurisdictional defect is obvious. Here, the Individual Plaintiffs' claims do not on their face appear obviously moot.

1.      *Legal Standards*

As noted above, "[o]n appeal from a district court's dismissal for lack of subject-matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*," *Avon Nursing & Rehab.*, 995

---

[6] The concurrence explains that "standing doctrine is not a box-checking exercise," *post* at 1, but then goes too far in suggesting that we must embrace "congressionally authorized representational standing" because it might have some connection to "principles we can derive from the history and tradition of representational standing," *id.* at 40. Although history and tradition can be useful for identifying harms that may qualify as concrete injuries, the inquiry is "not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *TransUnion*, 594 U.S. at 424-25.

We also note that while several Justices have acknowledged the "need for greater doctrinal coherence" in third-party standing doctrine, they have advised that "federal courts should take care to apply [the doctrine's] limitations conscientiously" in the meantime. *Trump v. CASA, Inc.*, 606 U.S. —, 145 S. Ct. 2540, 2565-66 (2025) (Alito, *J.*, concurring) (quotation marks omitted).

F.3d at 310-11 (quotation marks omitted), including "questions of . . . mootness," *Conn. Citizens Def. League*, 6 F.4th at 444.

In *International Code Council, Inc. v. UpCodes Inc.*, we held that a "district court erred by *sua sponte* and without notice construing the parties' pre-motion letters as briefing on a motion to dismiss and granting that motion." 43 F.4th 46, 53 (2d Cir. 2022). We have repeatedly instructed district courts not to "dismiss an action pending before it without first providing the adversely affected party with notice and an opportunity to be heard." *Id.* (quoting *McGinty v. New York*, 251 F.3d 84, 90 (2d Cir. 2001)). We have also warned that doing so can be grounds for vacatur. *See id.*

Proper notice "gives the adversely affected party a chance to develop the record to show why dismissal is improper; it facilitates *de novo* review of legal conclusions by ensuring the presence of a fully-developed record before an appellate court; and, it helps the trial court avoid the risk that it may have overlooked valid answers to what it perceives as defects in plaintiff's case." *McGinty*, 251 F.3d at 90 (citations omitted); *see also Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir. 1999) (explaining that failure to give proper notice "may tend to produce the very effect the court seeks to avoid—a waste of judicial resources—by leading to appeals and remands" (cleaned up)).

To be sure, we have "occasionally affirmed the granting of dispositive motions without full briefing." *Kowalchuck v. Metro. Transp. Auth.*, 94 F.4th 210, 217 (2d Cir. 2024). But "we have done so only when the issues were predominantly legal and the complaint had substantial deficiencies, while emphasizing our concerns with such an approach." *Id.* (quotation marks omitted). Of course, it is also

16

"well established that courts are obligated" to consider deficiencies in subject-matter jurisdiction *sua sponte*. *Int'l Code Council*, 43 F.4th at 54 n.1 (citing *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)). Nonetheless, it is "bad practice" to dismiss a case without providing a plaintiff the opportunity to be heard "[u]nless it is unmistakably clear that the court lacks jurisdiction." *Snider*, 199 F.3d at 113.

2. *Application*

The district court erred in dismissing this action based on three-page pre-motion letters without full briefing or a hearing. It is not obvious that the Individual Plaintiffs' claims are moot. On appeal, the Individual Plaintiffs argue that their claims are not moot for three reasons: (1) the "inherently transitory" exception to mootness applies, (2) their claims are "capable of repetition, yet evading review," and (3) Defendants voluntarily ceased their unlawful actions. *See Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982); *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953).

It is not "unmistakably clear" that these arguments are meritless, so the district court should consider them in the first instance after giving the parties the opportunity to brief a motion to dismiss.

C. Intervention

Finally, the Individual Plaintiffs argue that the district court erred in denying a motion to intervene filed by Plaintiffs' counsel. We disagree and conclude that the district court did not abuse its discretion in denying the motion.

17

1. *Legal Standards*

We review a district court's denial of a motion to intervene for abuse of discretion. *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 389 (2d Cir. 2006). "A district court abuses or exceeds the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or clearly erroneous factual finding— cannot be located within the range of permissible decisions." *Id.* at 385 (quotation marks omitted).

Under Rule 24(a) of the Federal Rules of Civil Procedure, "[t]o prevail on a motion for intervention as of right, a movant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 799 (2d Cir. 2022) (quotation marks omitted). "[A] failure to satisfy *any one* of these four requirements is a sufficient ground to deny the application." *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (cleaned up).

Under Rule 24(b), a court may permit anyone to intervene who on a timely motion "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). A district court has broad discretion in denying permissive intervention, and "a denial of permissive intervention has virtually never been reversed." *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 561 (2d Cir. 2005) (cleaned up).

18

2.  *Application*

The district court did not abuse its discretion in denying the motion to intervene as of right and by permission because the motion was untimely. "The timeliness requirement is flexible and the decision is one entrusted to the district judge's sound discretion." *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594-95 (2d Cir. 1986). Factors that the district court may consider include: "(a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness." *MasterCard Int'l*, 471 F.3d at 390 (cleaned up).

Here, the district court considered the circumstances of the case and found that the motion to intervene was untimely. The motion was filed over a year after the lawsuit began. Moreover, "Plaintiffs' counsel waited long after it was apparent that Defendants would continue their efforts to place [the Individual Plaintiffs], and, as such, plaintiffs would receive the very relief they sought, and their claims would become moot." *T.C. v. N.Y. State Dep't of Health*, No. 22-cv-5045, 2024 WL 689503, at *9 (S.D.N.Y. Feb. 20, 2024). The district court reasoned:

> More than a year ago, Plaintiffs filed the Amended Complaint and removed two of the original plaintiffs because they had been placed in community residences, even before Plaintiffs filed their motion for a preliminary injunction requesting prompt placement for each individual plaintiff. Shortly after the Court denied the

19

motion for a preliminary injunction, Defendants reported finding placements for several more plaintiffs. Yet Plaintiffs' counsel waited five months after that status report to seek intervention. The motion is not timely.

*Id.* (citations omitted). In short, the proposed intervenors were on notice of their interest in the case long before moving to intervene. That untimeliness is sufficient to deny the motion to intervene. *See Floyd*, 770 F.3d at 1057.[7]

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court dismissing the claims of DRNY for lack of standing and denying the motion to intervene. We vacate the judgment of the district court dismissing the Individual Plaintiffs' claims as moot and remand for further proceedings.

---

[7] Although we discern no abuse of discretion in the district court's denial of the motion to intervene, we note that the same analysis may not apply to a renewed motion to intervene in light of our decision to remand on the issue of mootness.

MYRNA PÉREZ, *Circuit Judge*, concurring in part and dissenting in part:

Congress authorized DRNY to bring lawsuits on behalf of its constituents, New Yorkers with developmental disabilities and mental illnesses, to protect their rights. The Court today holds that authorization unconstitutional by inventing a new limit on Article III standing not explained by the Constitution's limitation of federal jurisdiction to "Cases" and "Controversies." The majority opinion downplays this extraordinary arrogation of Congress's power to the courts by focusing on whether DRNY's theory of standing fits into one of a few discrete doctrinal categories that DRNY never argued apply to this case, knocking down a strawman of the Court's own creation. I respectfully dissent from Section II.A of the majority opinion affirming the dismissal of DRNY's claims for lack of standing.

Article III standing doctrine is not a box-checking exercise but a set of principles that "implements 'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); in turn quoting John G. Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993)). Those principles indirectly constrain Congress in extreme cases, such as where Congress has enacted a statute

that calls upon courts to exceed the judicial power vested therein by the Constitution. But we should be hesitant to take this shield against judicial overreach and use it as a sword to cut away at democratically enacted legislation. The majority opinion's misreading of Supreme Court precedent, rote application of standing doctrine as a checklist, and failure to take seriously the separation-of-powers principles underlying standing doctrine, have led it down the wrong path.

## I.

In this case, DRNY asserts representational standing—that is, standing to seek redress for harms suffered by its constituents, even though DRNY does not claim that it directly suffered harm. DRNY does not assert associational standing, a theory of representational standing commonly invoked by similar organizations, but instead bases its theory of standing in the powers granted to and duties imposed on it by statute, as a Protection and Advocacy ("P&A") system for New Yorkers with developmental disabilities and mental illnesses.

To determine whether DRNY can assert standing as authorized by Congress consistent with Article III, the majority opinion ought to have answered three broad questions. First, in what circumstances is representational standing consistent with Article III, and is it limited to a few discrete doctrinal categories like associational and "next friend" standing? Second, what power does Congress

2

have, if any, to create and recognize relationships that give rise to representational standing, and what are the constitutional limits on that power? Third, has Congress exercised that power here, consistent with the Constitution?

Instead, the majority opinion assumes, without analysis, that Congress has no role to play in articulating the relationships that can support representational standing, that the courts alone are the supreme federal lawmakers in this area, and that a few discrete doctrinal categories exclusively occupy the field. This view rests on a surface-level reading of precedent and fails to grapple with the complex interplay between the legislative and judicial powers throughout the Supreme Court's standing cases. In fact, as explained below, the statutes at issue here fit comfortably within Congress's limited, but nonetheless meaningful, power to shape the standing inquiry within the boundaries set by Article III.

II.

Any delineation of the scope and limits of representational standing must begin by situating it within the broader doctrine of Article III standing. The standing requirement arises from Article III of the Constitution, which "confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Diamond*, 145 S. Ct. at 2133 (quoting U.S. Const., art. III, § 2, cl. 1). Standing is a doctrine of judicial restraint, which "operates 'to ensure that federal courts do not exceed their

3

authority as it has been traditionally understood.'" *Faculty, Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ.* ("*FASORP*"), 11 F.4th 68, 74–75 (2d Cir. 2021) (quoting *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020); in turn quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The Supreme Court's standing cases "establish[] that the irreducible constitutional minimum of standing contains three elements: injury in fact, causation, and redressability." *Diamond*, 145 S. Ct. at 2133 (quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). If those elements are satisfied, the dispute meets the standing requirements of a justiciable "Case" or "Controversy."

The Supreme Court has also recognized that before any given plaintiff may ask a federal court to decide that dispute, the Constitution requires that she answer another "basic question—What's it to you?" *Id.* (quotation marks omitted) (quoting *All. for Hippocratic Med.*, 602 U.S. at 379; in turn quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). "In other words, plaintiffs must show that they possess 'a "personal stake" in the dispute' and are not mere bystanders." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 379); *see* Scalia, *supra*, at 882 ("The Supreme Court

4

has described standing as 'a sufficient stake in an otherwise justiciable controversy . . . .'" (quoting *Sierra Club v. Morton*, 405 U.S. 727, 731 (1972))).

The Supreme Court has explained that this requirement—that the plaintiff before the court have a personal stake in a dispute that satisfies the three prerequisites of standing—serves at least three purposes in restraining the federal courts. First, it "helps ensure that courts decide litigants' legal rights in specific cases . . . [and] do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982)). As *Alliance for Hippocratic Medicine* illustrates, federal courts are skeptical of theories that would grant litigants a broad license to manufacture controversies and challenge vast swaths of government policies. *See id.* at 391–92 (rejecting theory that would "allow doctors to sue in federal court to challenge almost any policy affecting public health"); *id.* at 394–95 (rejecting theory that would allow organizations to "manufacture [their] own standing" to "challenge almost every federal policy that they dislike").

Second, these requirements "tend[] to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating

5

society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* (quotation marks omitted) (quoting *Valley Forge*, 454 U.S. at 472); *accord Diamond*, 145 S. Ct. at 2133. Put differently, to decide whether a plaintiff has standing, "we ask whether it has alleged a personal stake in the outcome of the controversy, so as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *FASORP*, 11 F.4th at 74 (quotation marks omitted and alterations adopted) (quoting *Sierra Club*, 405 U.S. at 732).

Third, standing doctrine "protect[s] the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379–80 (quoting *Valley Forge*, 454 U.S. at 473).

These limits constrain federal courts in all cases, but their role in any given case varies based on the character of the injuries suffered by the plaintiffs before the court and the parties on whose behalf plaintiffs seek redress. To fully articulate the limits that these principles impose on standing, including representational standing, and why DRNY's theory fits within those limits, it is helpful to discuss

6

three categories of cases involving different kinds of injuries, which I refer to as first-party, representational, and third-party standing cases.

## A.

"First-party" standing—what the majority opinion calls "direct" standing—is the default in most cases. In first-party standing cases, the plaintiffs demonstrate that they possess the requisite "personal stake" by showing that they personally suffered concrete and particularized injuries traceable to the defendants and redressable by the courts. Such standing is often based on harm to one's person, property, or economic interests, but "various intangible harms" have been recognized as sufficient. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) (citing *Spokeo*, 578 U.S. at 340–41). An organization can assert first-party standing based on, for example, frustration of its mission (though DRNY has not done so here). *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 394–95; *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 129–30 (2d Cir. 2020); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110–11 (2d Cir. 2017).

A plaintiff who has personally experienced the kind of injury that Article III requires will generally possess a sufficiently "personal stake" in redressing that injury. The Supreme Court has even said that, "the general 'personal stake'

requirement and the more specific standing requirements (injury in fact, redressability, and causation) are flip sides of the same coin" and "simply different descriptions of the same judicial effort to ensure, in every case or controversy, 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Sprint Comm'cns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). First-party standing is so common that courts sometimes use shorthand suggesting that first-party standing is the only kind. *See, e.g., All. for Hippocratic Med.*, 602 U.S. at 380 ("[A] plaintiff must demonstrate . . . that she has suffered or likely will suffer an injury in fact . . . ."); *Spokeo*, 578 U.S. at 339 ("[A] plaintiff must show that he or she suffered 'an invasion of a legally protected interest' . . . ." (quoting *Lujan*, 504 U.S. at 560)). But as discussed below, first-party standing is not the whole story.

B.

"Representational" (or "representative") standing is a category distinct from first-party standing. Some courts use the term "representational standing" as a synonym for associational standing, but that is just one of many forms. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). I use the term "representational standing" in the same sense in

8

which the Supreme Court used it in *United Food & Commercial Workers Union Local 751 v. Brown Group* ("*UFCW*"), as a catch-all term for the many theories under which federal cases may be brought by plaintiffs who have not personally suffered any injury, but who sue in a representative capacity to seek redress for injuries suffered by others. 517 U.S. 544, 557 (1996); *see also Sprint*, 554 U.S. at 287 ("[F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit.").

In *UFCW*, the Supreme Court recognized "representational standing" as a subset of standing doctrine that "rests on the premise that in certain circumstances, particular relationships (recognized either by common-law tradition or by statute) are sufficient to rebut the background presumption (in the statutory context, about Congress's intent) that litigants may not assert the rights of absent third parties." 517 U.S. at 557 (footnotes omitted). "[R]epresentational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth*, 422 U.S. at 511. In every such case, the plaintiff must allege that it represents the interests of a party or parties who "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the [represented parties] themselves brought suit." *Id.*

9

The Court in *UFCW* also recognized that "associational standing," by which an organization can seek redress for harm to its members if it satisfies certain requirements, "is only one strand" of representational standing (again, one on which DRNY expressly does not rely). 517 U.S. at 557. To date, neither we nor the Supreme Court have exhaustively enumerated the relationships that can support representational standing. *See Doe v. Hochul*, 139 F.4th 165, 177, 180 (2d Cir. 2025) (noting "we have long acknowledged several narrow exceptions" to the first-party standing default, "under which a plaintiff may invoke the injuries of a third party to establish standing," including, but not necessarily limited to, associational and "next friend" standing). Yes, dicta in some cases implies that organizations can have standing in only "two ways"—associational or first-party "organizational" standing. *Cf. N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). But the Supreme Court's representational standing cases, discussed below, make clear that phrasing is hasty shorthand rather than an accurate portrayal of the doctrine. In fact, associational standing is just one of several potential answers to the question, "When does an organization . . . have a personal stake in the outcome of a litigation such that it is entitled to sue?" *FASORP*, 11 F.4th at 75.[1]

---

[1] As the majority opinion notes at 12–13, *UFCW* itself addressed the requirements of associational standing, in the context of claims brought by a labor union, a paradigmatic membership organization. But the Court

10

Representational-standing relationships arise from various sources, as *UFCW* recognized. Associational standing, for example, has been elaborated by the courts, with the canonical test having been articulated in *Warth*, 422 U.S. at 511, and *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342–44 (1977). Other relationships are enshrined in federal and state statutes, in more or less "ancient" traditions of common law and equity, or in some combination thereof. *See, e.g.*, *Brnovich v. DNC*, 594 U.S. 647, 665 (2021) (holding attorney general had standing to appeal as a party over objection of other state actors because he was "authorized to represent the State in any action in federal court"); *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 543–44 (2020) (recognizing "guardians, receivers, and executors" who were "legally or contractually appointed to represent" injured parties as exceptions to the usual rule that a plaintiff only has "a sufficiently concrete interest in the outcome of the issue in dispute" if they "themselves . . . have suffered an injury in fact" (quotation marks omitted) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013))); *Sprint*, 554 U.S. at 287–88, 290 (holding assignees had standing even though they were "suing based on

did not hold that associational standing is the only theory of representational standing that may be asserted by any organizational plaintiff; it acknowledged associational standing as "only one strand" of the doctrine. *Id.* at 557. The Court held that the union had standing "[b]ecause Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed." *Id.* at 558. As explained below, the same is true in this case.

11

*injuries* originally suffered by third parties," and listing "[t]rustees," "guardians ad litem," "receivers," "assignees in bankruptcy," and "executors" among representational-standing relationships); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773–74 (2000) (concluding "the United States' injury in fact suffices to confer standing on" a relator, because False Claims Act effected "partial assignment," and while the Court had not "expressly recognized 'representational standing' on the part of assignees," it had "routinely entertained their suits . . . and also suits by subrogees, who have been described as 'equitable assignees'"); *Whitmore v. Arkansas*, 495 U.S. 149, 164–65 (1990) (recognizing "next friend" standing in accordance with "the ancient tradition of the doctrine," but suggesting it also rests on "congressional authorization"); *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 324–26 (1980) (holding EEOC is authorized to "sue in its own name" to seek "relief, such as hiring or reinstatement, constructive seniority, or damages for backpay or benefits denied, on behalf of discrimination victims"); *see also UFCW*, 517 U.S. at 557 n.8 (listing EEOC's standing to enforce Title VII and Secretary of Labor's standing to enforce the Fair Labor Standards Act as examples of representational standing). These cases show that in a variety of circumstances, not limited to associational and "next friend" standing, Article III permits an

12

uninjured plaintiff to invoke federal jurisdiction to seek redress for harm suffered

by another, as long as they have a relationship of sufficient constitutional pedigree.

C.

"Third-party standing," on the other hand, refers to a doctrine that has long

been invoked in a subset of *first-party* standing cases, though its status as part of

Article III standing doctrine is now in doubt. In third-party standing cases, "the

litigants themselves still must have suffered an injury in fact." *All. for Hippocratic*

*Med.*, 602 U.S. at 393 n.5 (quoting *Hollingsworth*, 570 U.S. at 708). But historically,

where a plaintiff's first-party injury was caused by an action that somehow more

directly injured a third party, the "so-called third-party standing bar" has

sometimes blocked the suit, even though the plaintiff's injury otherwise met

Article III requirements. *See N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69,

74–75 (2d Cir. 2019). The third-party standing bar could be overcome where the

plaintiff and third party had a close relationship and there existed some barrier to

the third party asserting their own rights. *Id.* at 75. But third-party standing, and

its "relationship-plus-obstacle" test,[2] have been understood as part of "a

---

[2] Curtis Bradley & Ernest Young, *Unpacking Third-Party Standing*, 131 Yale L. J. 1, 3 (2021). Some commentators have used the phrase "third-party standing" as an umbrella term for various situations in which the plaintiffs before the court are not the only ones who were harmed by the defendants' challenged actions, including where the plaintiffs (1) were not harmed at all but sue as representatives, (2) were personally harmed by an action that also infringes upon rights held by third parties, and (3) were personally

13

'prudential' branch of standing, a doctrine not derived from Article III," which is on uncertain footing since the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

In *Lexmark* the Supreme Court addressed "three broad principles" that made up traditional "prudential standing" doctrine and recognized that at least two of those principles were misnamed as such. *Id.* at 126 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)). First was "the rule barring adjudication of generalized grievances," which is no longer considered prudential but now is part of the constitutional case-or-controversy requirement. *Id.* at 126, 127 n.3 (quotation

---

harmed in effectively the same way as third parties. *See id*. at 6. I use "representational standing" to refer to the first category, and when I use the term "third-party standing," I generally refer to the second category, where the existence of an injured third party sometimes bars assertions of first-party standing.

As those same commentators have noted, the third category above is traditionally the realm of aggregate litigation tools like multi-district litigation ("MDL") and class action practice. In my view, while those mechanisms may raise interesting due process questions, "third-party standing" is generally a non-issue. MDLs are generally made up of many suits brought by plaintiffs who each have standing. And in a class action, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117–18 & n.1 (2d Cir. 2022). The standing of absent class members, even in the most muscular conception of standing's role in class actions, comes into play only in the predominance inquiry required to certify a damages class, if ever. *See Lab'y Corp. of America Holdings v. Davis*, 145 S. Ct. 1608, 1611 (2025) (Kavanaugh, J., dissenting) ("Rule 23 authorizes damages class certification only when common questions of law and fact predominate. A damages class consisting of both injured and uninjured members does not meet that requirement."); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (stating, in a putative Rule 23(b)(3) class action, that "no class may be certified that contains members lacking Article III standing"); *Hyland*, 48 F.4th at 118 n.1 (clarifying that that "single sentence in *Denney*" does not heighten the requirements of Article III standing for class actions). However, even if one believes a third-party standing bar continues to apply, and one reconceptualizes class actions as raising a potential third-party standing issue, the problem is already taken care of by existing Rule 23 requirements, which "tend to be considerably more rigorous than their family relations in the traditional law of third-party standing." Bradley & Young, *supra*, at 71–72.

14

marks omitted). Second was "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked," which is now not about "standing" at all, but is simply a principle of interpretation used to discern on whom a given law bestows a cause of action (or a defense). *Id.* at 126–27 & n.3. And third was "the general prohibition on a litigant's raising another person's legal rights," which had been applied to limit third-party standing. *Id.* at 126, 127 n.3 (quotation marks omitted). While the Court reserved the question of third-party standing's "proper place in the standing firmament," *id.*, it "cast doubt on the entire doctrine of prudential standing," leaving "considerable uncertainty as to whether the third-party standing rule continues to apply." *Poole*, 922 F.3d at 75.

To the extent there is a need for "greater doctrinal coherence," it may be found by conceptualizing any third-party standing "bar" as resting on the same principles as representational standing, derived from Article III's "personal stake" requirement. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2565 (2025) (Alito, J., concurring) (quoting Curtis Bradley & Ernest Young, *Unpacking Third-Party Standing*, 131 Yale L. J. 1, 7 (2021)). As the Supreme Court said in *UFCW*, almost two decades before *Lexmark*, "the general prohibition on a litigant's raising another person's legal rights" is best understood not as a prudential bar to claims by

15

plaintiffs with first-party standing, but as a "background presumption" against representational standing, which can be rebutted by "particular relationships (recognized either by common-law tradition or by statute)." *UFCW*, 517 U.S. at 557. Under this conception of standing, where an *uninjured* plaintiff seeks redress for an Article III injury suffered by a third party, the representative plaintiff presumptively lacks the required personal stake and bears the burden to establish a relationship that allows him to assert the absent party's rights. But where a plaintiff is personally *injured* in a manner that meets the minimum requirements of Article III (and has a cause of action), that plaintiff asserts his own right to seek redress and enjoys a strong presumption that his injury gives him "a sufficiently concrete interest in the outcome of the issue in dispute." *All. for Hippocratic Med.*, 602 U.S. at 393 n.5. In such a case, a federal court "cannot apply its independent policy judgment" to "limit [that] cause of action . . . merely because 'prudence' dictates." *Lexmark*, 572 U.S. at 128.

That is not to say the concept of third-party standing has no place in standing doctrine after *Lexmark*. Extreme assertions of first-party standing by plaintiffs with too tenuous a "personal stake" could undermine the separation of powers and distort the judicial role just as excessive indulgence of representational

16

standing could.  Thus, a court might still deny standing to first-party plaintiffs who assert the power to "roam the country in search of governmental wrongdoing," whose lawsuits threaten "the 'autonomy' of those who are most directly affected," and who leave the courts without "a realistic appreciation of the consequences of judicial action."  *All. for Hippocratic Med.*, 602 U.S. at 379.  For example, in the 2020 abortion-rights case *June Medical Services L.L.C. v. Russo*, when four Justices of the Supreme Court said they would apply the third-party standing bar to the provider plaintiffs, they rooted their arguments in concerns about the autonomy of those who might seek abortions, and whether the providers would present issues in a way that would adequately represent the third-parties' interests.  591 U.S. 299, 401–03 (2020) (Alito, J., dissenting) (arguing that a "potential conflict of interest between the plaintiff and the third party" precluded "third-party standing," though such arguments are foreclosed by precedent in that context even under a more restrictive view of the third-party standing bar), *overruled in part by*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).  And in *Alliance for Hippocratic Medicine*, the recent challenge to federal approval of the medication mifepristone, the Supreme Court only briefly mentioned the third-party standing bar explicitly, but the Court identified similar concerns in rejecting the plaintiffs' claims to first-

party standing. The plaintiffs there asserted just the sort of standing theories that, if they were accepted, would undermine the judicial role by allowing doctors and organizations to roam the country, ginning up standing to challenge any government policy they disliked. *See All. for Hippocratic Med.*, 602 U.S. at 391, 395.

Outside of those edge cases, however, the Supreme Court has seemingly abandoned any general rule against injured parties seeking redress for their injuries by invoking the rights of others, if one ever really existed. This term, in *Diamond*, the Court held that fuel producers had standing to challenge regulations of automakers without analyzing whether they had any relationship or whether the automakers could sue in their own right. 145 S. Ct. at 2134–38. That case echoed one from a hundred years earlier, where the Court allowed a private school to challenge a law that regulated parents, again without discussing whether the parents should assert their own rights. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). In the meantime, the Court has allowed all manner of private challenges to purported structural constitutional violations. Before *Lexmark*, even when such structural challenges were asserted defensively, the Court felt compelled to explain how individuals asserting rights rooted in federalism were actually asserting their own first-party rights, not generally dispersed third-party rights.

18

*See Bond v. United States*, 564 U.S. 211, 220–24 (2011). But more recently, the Court did not pause to consider who—other than the President—has an individual right to demand greater Presidential control over executive branch officials. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 210–11 (2020).

In sum, I have no dispute with those who claim the prudential form of third-party standing doctrine has long been applied inconsistently. *See, e.g.*, Bradley & Young, *supra*, at 3. To the extent some third-party standing cases can be reframed in terms of constitutional principles, I agree they are the same principles of judicial restraint that counsel against representational standing in some—but not all—cases. Representational standing is an appropriate exception to the default of first-party standing that brings more disputes within the scope of Article III, though it is reserved for certain relationships "recognized either by common-law tradition or by statute." *UFCW*, 517 U.S. at 557. Third-party standing, on the other hand, just describes a common variant of first-party standing that courts usually permit and only selectively police and which, properly understood, is rarely if ever relevant to jurisdiction to redress first-party injuries. Turning more attention to Article III's "personal stake" requirement, as the principle that constrains both

representational standing and "third-party" standing, may focus courts on reining in extreme assertions of standing that threaten to distort the judicial role.

III.

The body of standing precedent discussed above, while still just a sliver of the full picture, offers a wider aperture than the majority opinion does through which to appreciate the limited but important role of representational standing in defining the judicial power, including Congress's role in shaping it at the margins. The Supreme Court's standing cases make plain that representational standing is permitted in a range of cases outside of associational and "next-friend" standing, and it is distinct from the "third-party" standing doctrine that once "barred" certain first-party plaintiffs' causes of action if they could not meet a "relationship-plus-obstacle" test. Bradley & Young, *supra*, at 3. With those issues out of the way, it is clear that Congress has a role to play in creating and recognizing relationships that support representational standing. Relators, next friends, and federal executive branch agencies, among others, rely on federal statutes to one degree or another for their capacity to invoke federal jurisdiction. Many others rely on state legislative enactments that, one would think, do not confer higher status under Article III than federal law. The question, however, is what limits the Constitution places on Congress's power to recognize representational-standing relationships.

20

This power, like all of Congress's powers, is limited, since it "is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 578 U.S. at 339 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)). And those limits must arise from a source other than the three irreducible minima of standing—injury in fact, causation, and redressability—because representational standing, by definition, comes into play only where those requirements are satisfied, but by a third party's injury. The natural source of limits on this power is thus Article III's "personal stake" requirement. The Supreme Court has not squarely addressed the precise limits imposed by the "personal stake" requirement outside of the three black-letter elements of standing above, but the Court has elaborated on its content in recent cases like *Diamond* and *Alliance for Hippocratic Medicine*. Further, the Court has begun to articulate the limits of Congressional power over standing in cases like *Spokeo* and *TransUnion*. The principles articulated in those cases should guide any evaluation of claims to representational standing, as explained below.

A.

The Supreme Court's recent decisions on Congress's role with respect to the injury-in-fact requirement offer a useful frame for considering Congress's role in

21

shaping representational standing. In *Spokeo*, the Supreme Court held that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 578 U.S. at 341. But while the majority opinion reads *Spokeo* to say that Congress therefore has *no* role whatsoever to play in informing courts' Article III standing inquiry, that is simply not what the Supreme Court said. True, Congress cannot authorize private plaintiffs to invoke federal jurisdiction to redress injuries that are not "concrete" or that represent "generalized grievances." *Id.* at 341 (concreteness); *TransUnion*, 594 U.S. at 417 (same); *cf. Hollingsworth*, 570 U.S. at 715 (holding state legislature cannot authorize a private party to redress a "generalized grievance"). Any injury complained of in federal court "must be '*de facto*'; that is, it must actually exist." *Spokeo*, 578 U.S. at 340. But if that threshold is met, Congress has power to "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," and "to define injuries and articulate chains of causation that will give rise to a case or controversy *where none existed before*." *Id.* at 341 (alteration adopted and emphasis added) (quoting *Lujan*, 504 U.S. at 578; then quoting *id.* at 580 (Kennedy, J., concurring)).

22

The same basic framework can be applied to representational standing, where Congress confronts the "personal stake" requirement generally, rather than "injury in fact." Congress cannot authorize just *anyone* to assert the rights of anyone else in federal court. *Hollingsworth*, 570 U.S. at 710 (rejecting proposition that "mere authorization to represent a third party's interests is sufficient to confer Article III standing on private parties with no injury of their own"). As the *Spokeo* Court might have put it, their relationship "must actually exist," which here means the plaintiff must *actually* have a "personal stake" in the dispute and "cannot be a mere bystander." *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *TransUnion*, 594 U.S. at 423). Such a relationship ensures that the representational plaintiff is not simply "roam[ing] the country in search of governmental wrongdoing," will faithfully represent the injured party's rights and give the courts "a realistic appreciation of the consequences of judicial action," and will not infringe on "the 'autonomy' of those who are most directly affected." *Id.* (quoting *Valley Forge*, 454 U.S. at 472, 473, 487). But where such a relationship exists—including where it has been created by Congress and endowed with features that traditionally support representational standing—the logic of *Spokeo* tells us that Congress can recognize that relationship as a basis for representational standing.

23

B.

The next question a court must answer, in applying the *Spokeo* framework to representational standing claims rooted in statute, is when a relationship is sufficiently real and meaningful to merit recognition. This inquiry may be guided to some extent by the long "history and tradition" in which Congressionally authorized representational standing follows. Supreme Court precedent on the injury-in-fact requirement again teaches that, at a minimum, Congress has power to recognize Article III standing in situations that have "a close historical or common-law analogue." *TransUnion*, 594 U.S. at 424 ("[H]istory and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." (quotation marks omitted) (quoting *Sprint*, 554 U.S. at 274)).

Importantly, when courts apply this "history and tradition" approach across a range of constitutional adjudications, they seek a "historical *analogue*, not a historical *twin*," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022). "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition, *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (emphasis added). Careful review of the relevant tradition here reveals that the Supreme Court's representational

24

standing doctrine follows the principles of the "personal stake" requirement laid out in the Court's recent cases: ensuring courts only address specific cases with real stakes, which promise vigorous adversary presentation of important issues, and protect the autonomy of those most affected.

Next-friend standing, for example, follows in an "ancient tradition," but the Supreme Court has expressed doubt about "whether a 'next friend' may ever invoke the jurisdiction of a federal court absent congressional authorization." *Whitmore*, 495 U.S. at 164–65. Whether the "next friend" relationship owes its status under Article III to recognition by the common law or by Congress, one of its fundamental requirements is that "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." *Id.* at 163. This requirement, along with the requirement that the injured party be unable to appear himself, ensures that next-friend standing cannot "be availed of, as matter of course, by intruders or uninvited meddlers, styling themselves next friends." *Id.* at 164 (quoting *U.S. ex rel. Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921)). But next-friend standing does not require a pre-existing "significant relationship" between the plaintiff and the injured party. *See id.* at 163–64 (leaving this question open); *Doe*, 139 F.4th at 174 (holding that this is not a requirement). In other words,

it requires only that the court satisfy itself that the plaintiff has a personal stake in the outcome of the lawsuit sufficient to safeguard the interests discussed above.

The various categories of representational-standing relationships that are recognized primarily by state law, some of which are also recognized by Congress, function similarly. These relationships, many of which are helpfully cataloged in Federal Rule of Civil Procedure 17, are generally characterized either by duties to the represented parties (such as care and loyalty)—in the cases of trustees, executors, administrators, conservators, committees, guardians, and other fiduciaries—or by consensual exchange in which the injured party can bargain for the duties he wants owed to him—in the case of assignees, bailees, and others. *See* Fed. R. Civ. P. 17(a)(1)(A)–(F), (c)(1); *see also* Fed. R. Civ. P. 17(a)(1)(G) (authorizing "a party authorized by statute" to sue in their own name for the benefit of another).

While many of the foregoing relationships are primarily creatures of state law, analogous relationships have also been created from whole cloth by Congress and recognized as conferring representational standing. *See Vt. Agency*, 529 U.S. at 765–66 (construing the relationship between the government and a False Claims Act relator, created by Congress, as conferring representational standing because the Act effected a "partial assignment"). The Supreme Court has recognized that

26

these relationships, in which a representative plaintiff is appointed either by the injured party or by operation of law, substitute for the "concrete interest in the outcome of the issue in dispute" that usually comes from personally suffering injury. *Thole*, 590 U.S. at 543 (quoting *Hollingsworth*, 570 U.S. at 708); *Sprint*, 554 U.S. at 288–89 (discussing common law recognition that assignees have a sufficient "personal stake" to give rise to "concrete adverseness").[3]

The major category of representational standing created by the courts follows a similar pattern. At the outset of the *Hunt* test for associational standing, the organization must demonstrate either that it has actual members, or that its constituency bears sufficient "indicia of membership," such as voting rights and/or the power of the purse. 432 U.S. at 344–45. But even where that requirement is met, indicating that the organization will likely faithfully represent its members as a general matter, the court must assure itself that other requirements are met in the specific case. The suit must be "germane" to the organization's purpose and its members must be injured in a way that would otherwise confer standing, *id.* at

---

[3] It is no answer to say that such parties do not assert representational standing because they are not really parties at all but simply litigate on behalf of the "real party in interest." *See* Fed. R. Civ. P. 17; *Sprint*, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting). "[T]his is just a legal fiction," and "[i]n practice" the representative party "initiates the suit, asserts the [represented party's] rights, and controls the litigation," and may even take actions "against the [represented party's] own expressed wishes." Bradley & Young, *supra*, at 63–64 (discussing specific context of next friends litigating on behalf of incarcerated people).

343, which assures that cases arise in "concrete factual context[s] conductive to a realistic appreciation of the consequences of judicial action," and the organization is not merely "roam[ing] the country in search of governmental wrongdoing." *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge*, 454 U.S. at 487). And the suit must be able to proceed without requiring the participation of the injured members, *Hunt*, 432 U.S. at 343, which protects those members' "autonomy." *All. for Hippocratic Med.*, 602 U.S. at 379 (quotation marks omitted).[4]

Lastly, a common and vitally important form of Congressionally recognized representational standing arises when Congress authorizes federal agencies to seek redress on behalf of specific individuals. Examples include the authorities of the EEOC to seek back pay on behalf of discrimination victims, and of the Secretary of Labor to seek unpaid wages. *See Gen. Tel. Co.*, 446 U.S. at 324; 29 U.S.C. § 216(c). *See generally UFCW*, 517 U.S. at 557 n.8 (listing these examples of representational-standing relationships recognized "by statute"). These authorities are distinct in important ways from, for example, other agencies' authorities to assert the purely

---

[4] The Supreme Court has said that this third requirement of *Hunt* is "prudential," rather than constitutional, *UFCW*, 517 U.S. at 555. But after *Lexmark* cast doubt on the entire concept of prudential standing, the Supreme Court has suggested this third prong may be constitutional in nature after all. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199, 201 (2023) (noting "SFFA satisfies the three-part test for organizational standing" from *Hunt*, and "[b]ecause SFFA complies with the standing requirements demanded of organizational plaintiffs in *Hunt*, its obligations under Article III are satisfied").

sovereign interest of the United States in the enforcement of the laws. The distinctions between these authorities illuminate fundamental principles of, and limits on, statutory representational standing.

The requirements for governmental standing as a subset of representational standing depend on the nature of the injury being asserted. On the one hand, executive agencies plainly may have standing to enforce federal law, though they still require Congressional authorization to assert such representational standing on behalf of the United States. *See Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995) ("[W]hen an agency in its governmental capacity *is* meant to have standing, Congress says so." (emphasis in original)). However, because an injury to that purely sovereign interest would be a mere "generalized grievance" in the hands of a private party, the Supreme Court has suggested that a plaintiff must be a true "agent[] of the people" in order to assert it. *Hollingsworth*, 570 U.S. at 706, 712. Otherwise, the plaintiff will "have no 'personal stake' in defending its enforcement that is distinguishable from the general interest of every citizen." *Id.* at 707; *see also, e.g.*, Myriam E. Gilles, *Representational Standing:* U.S. ex rel. Stevens *and the Future of Public Law Litigation*, 89 Calif. L. Rev. 315, 353–54 (2001) (noting that "[t]he agency concept alone is

29

suited to the pursuit of sovereign interests" which "are analogous to private law claims that are 'personal' and non-assignable").

The presumption recognized in *Hollingsworth*—that the government has standing and private parties do not, when purely sovereign interests are at stake—is flipped where the government seeks to redress concrete, particularized harms to private persons. In such cases, the government cannot rely solely on its sovereign standing to prevent and punish violations of its laws, since "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. And "ordinarily the United States cannot sue simply to advance the private interests of some third party." Wright & Miller, Fed. Prac. & Proc. Juris. § 3531.11 (3d ed., May 2025 update); *see United States v. San Jacinto Tin Co.*, 125 U.S. 273, 286 (1888) (holding that a suit by the government "must fail" if it "has actually been brought for the benefit of some third person, and . . . no obligation to the general public exists which requires the United States to bring it").

This background presumption *against* government standing, however, may be overcome where the statute is structured to give the agency a sufficient stake in the litigation—that is, where Congress creates a relationship by statute that it can

30

then recognize as a basis for representational standing. For example, Title VII makes the EEOC responsive to the interests of the injured parties in a way that addresses many values protected by the "personal stake" requirement, including autonomy and concrete adverseness. *See Gen. Tel. Co.*, 446 U.S. at 326 (noting that when the EEOC acts "at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest," and that "the aggrieved person may bring his own action" if the EEOC does not act quickly and "may also intervene in the EEOC's enforcement action"); *All. for Hippocratic Med.*, 602 U.S. at 379. And the Fair Labor Standards Act, among other things, can be understood to effect a partial assignment of a private claim to the Secretary—the mirror image of the assignment effected by the False Claims Act—by providing that residual recoveries not paid out, "shall be covered into the Treasury of the United States." 29 U.S.C. § 216(c); *see Vt. Agency*, 529 U.S. at 773. Those grants of authority within the Executive branch resemble the conditions under which Congress assigns representational standing to private parties, as next friends, assignees, and otherwise.

The lesson of all this is, again, that representational standing has been recognized in a great variety of factual and legal settings. Some such relationships are created and recognized by statute, including by state legislatures and

31

Congress. There is no reason to believe representational standing functions as a multiple-choice menu from which a prospective plaintiff must choose, rather than a set of principles rooted in Article III that guide courts even when they are asked to apply the doctrine to what appears to be a new fact pattern. And at a minimum, where Congress creates a relationship that gives a representative party a sufficient "personal stake" in litigation on behalf of another and gives that representative standing to sue, it follows in a long "history and tradition" full of close analogues that put its legislation on firm constitutional footing. *TransUnion*, 594 U.S. at 424.[5]

## IV.

Applying the foregoing principles to the facts before us, I see no basis in the relevant statutes or in the Constitution to deny DRNY standing, and the majority opinion certainly has not supplied one. Congress created a detailed framework to

---

[5] None of this is to say that courts, particularly inferior federal courts, should be free to recognize new forms of representational standing based on free-floating application of Article III's "personal stake" requirement, in situations where Congress has *not* authorized it. *Contra* Maj. Op. at 15 n.6. As the Supreme Court observed in *UFCW*, representational-standing relationships may be "recognized either by common-law tradition or by statute," which places Congress and the courts in distinct roles. 417 U.S. at 557 (footnotes omitted). Congress is free to deviate from common-law defaults by statute, within the limits set by Article III, and therefore can create new representational standing schemes from whole cloth, like the one DRNY invokes. *See, e.g.*, *Jesinoski v. Countrywide Home Loans, Inc.*, 574 U.S. 259, 264 (2015) ("[T]his is simply a case in which statutory law modifies common-law practice."). Federal courts, on the other hand, must at least act more incrementally in elaborating the common law, and generally we are constrained to apply the law as established by Congress and the states. *See, e.g.*, *Smith v. United States*, 30 U.S. 292, 300 (1831) ("The legislature may establish new rules of evidence, in derogation of the common law, but the judicial power is limited to the rule laid down."). This is all the more reason why the majority opinion's fabrication of a new judge-made limit on Article III standing in this case is an act of judicial overreach, not judicial restraint.

govern P&A systems like DRNY and, having endowed those entities with the prerequisites of representational standing, recognized that Article III allows them to bring suit in federal court on behalf of their constituents. That authorization deserves the same strong "presumption of constitutionality" that almost all federal statutes enjoy, and because it does not clearly conflict with Article III, it should have been upheld. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 148 (1938).

## A.

The text, context, and history of DRNY's authorizing statutes make plain that Congress intended to authorize DRNY to assert representational standing. As the majority opinion notes, there are two related statutory schemes at issue here: the Developmental Disability Assistance and Bill of Rights Act of 1975 ("DD Act"), and the Protection and Advocacy of Individuals with Mental Illness Act of 1985 ("PAIMI Act"). In both, Congress enacted detailed factual findings concerning the vulnerability of individuals with developmental disabilities and mental illnesses, and the inadequacy of then-existing systems to protect their rights. *See* 42 U.S.C. § 15001(a) (finding that "(4) individuals with developmental disabilities often encounter discrimination in the provision of critical services" and "(5) individuals with developmental disabilities are at greater risk than the general population of

33

abuse, neglect, financial and sexual exploitation, and the violation of their legal and human rights"); *id.* at § 10801(a) (finding that "(1) individuals with mental illness are vulnerable to abuse and serious injury" and "(4) State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate"). Each statute had as one of its major goals the creation of P&A systems to "protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes." *Id.* § 10801(b)(2)(A); *see id.* § 15001(b) ("The purpose of this subchapter is to assure that individuals with developmental disabilities and their families participate in the design of and have access to . . . (2) protection and advocacy systems in each State to protect the legal and human rights of individuals with developmental disabilities").

Both statutes pursued this goal in similar ways. The DD Act granted P&A systems authority to access facilities and records, investigate abuse and neglect, and "pursue legal, administrative, and other appropriate remedies . . . to ensure the protection of, and advocacy for, the rights of" people with developmental disabilities. 42 U.S.C. § 15043(a)(2)(A)(i), (B), (H), (I), (J). This includes authority to "bring[] a suit on behalf of individuals with developmental disabilities against

34

a State, or an agency or instrumentality of a State."  *Id.* § 15044(b)(1).  The PAIMI

Act similarly authorizes P&A systems to enforce federal and state law on behalf of

their constituents by granting access to facility and constituent records, authority

to investigate abuse and neglect, and authority to "pursue administrative, legal,

and other appropriate remedies to ensure the protection of individuals with

mental illness."  *Id.* § 10805(a)(1), (3), (4).  Again, this includes the authority, in

certain cases, to "institut[e] . . . legal action in a Federal or State Court on behalf of

a[n] individual with mental illness."  *Id.* § 10807(a); *see also id.* § 10805(a)(1)(C).

While these statutes are unambiguous, the legislative history confirms that

Congress intended to confer standing on P&A systems.  When Congress amended

and re-enacted the DD Act in 1993, it considered whether to amend the statute to

more clearly grant P&A systems standing to sue, and it decided "no statutory fix

is necessary."  S. Rep. 103-120, at 39 (1993), *as reprinted in* 1994 U.S.C.C.A.N. 164,

202.  The committee expressly agreed with two district courts that had already

found, in effect, that P&A systems had representational standing and determined

that "the current statute is clear that P&A systems have standing to pursue legal

remedies to ensure the protection of and advocacy for the rights of individuals

with developmental disabilities."  *Id.*; *see ACLU v. Clapper*, 785 F.3d 787, 819 (2d

Cir. 2015) (noting that, even where Congress does not expressly say so, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change" (quotation marks omitted)). Taken together, these provisions make clear that Congress intended to authorize P&A systems, including DRNY, to bring suit on behalf of their constituents and seek redress for violations of their rights.

The majority opinion is wrong to suggest that the statutory language "is consistent with a P&A System's ability to bring claims as a legal advocate for its constituents," but "not necessarily . . . as a representational plaintiff." Maj. Op. at 12 n.4. That reading is unreasonable because, unlike an agency that owes its entire existence and all its powers to Congress, like the Federal Trade Commission, *cf.* Maj. Op. at 14 n.5, an organization like DRNY does not need Congress's permission to provide legal services to the people on whose behalf it advocates. If all these provisions meant was that DRNY could act like a non-profit law firm, then significant pieces of the statutes would be surplusage. *See Fischer v. United States*, 603 U.S. 480, 486 (2024) ("[W]e must give effect, if possible, to every clause and word of the statute." (alteration adopted and quotation marks omitted)). Where Congress confers quasi-public responsibilities on an entity outside of the

federal government, there is no basis for a magic-words test requiring Congress to specify that it may sue "in its own name."  Maj. Op. at 14 n.5.  An unambiguous authorization to sue in federal court on behalf of one's constituents is enough.[6]

To the extent any doubt lingers, other textual features of these statutes confirm that they authorize DRNY to act as a representational plaintiff, not merely to offer legal aid.  For example, § 15044(b) provides that when a P&A system brings "a suit on behalf of individuals with developmental disabilities against a State" and wins a monetary award, the P&A system may not use the money it won to pay "legal contractors or to award personal bonuses."  That provision would be superfluous if P&A systems were authorized only to help their constituents bring their own lawsuits.  Similarly, § 10807(a) provides that, while P&A systems generally must exhaust administrative remedies, in cases of delay, P&A systems may bypass administrative procedures and "initat[e] . . . a legal action."  That provision also makes sense only if P&A systems can sue in their own right.  If P&A

---

[6] In contrast, when the Supreme Court rejected an assertion of statutory representational standing in *Thole*, the relevant provisions of ERISA only granted defined-benefit plan participants "a general cause of action to sue for restoration of plan losses and other equitable relief," and did not specifically grant them power to sue on behalf of others.  590 U.S. at 544 (citing 29 U.S.C. § 1132(a)(2), (3)); *see id.* at 564–66 (Sotomayor, J., dissenting) (arguing that was an appropriate case for representational standing).  In other words, unlike DRNY's authorizing statutes, ERISA could reasonably be read as authorizing participants to seek certain remedies only as necessary to redress harm they suffered personally.  Or at least, the ERISA provisions were not clear enough to rebut the "background presumption (in the statutory context, about Congress's intent)" that disfavors representational standing in most (but not all) cases.  *UFCW*, 517 U.S. at 557.

systems could act only as non-profit law firms for their constituents, it would be bizarre to create different administrative exhaustion rules for similarly situated individuals based only on which lawyer they happen to hire.

B.

Finally, given that Congress unambiguously authorized representational standing, the last question is whether Congress exceeded its power in doing so. In my view, three aspects of DRNY's authorizing statutes ensure that DRNY has a "personal stake" in litigating these claims on behalf of its constituents, and bring its assertion of standing comfortably within the long and varied traditions of other forms of representational standing. Accordingly, I would conclude that DRNY's assertion of standing here is consistent with Article III.

First, the statutes contain numerous features that ensure DRNY represents its constituents' interests zealously and faithfully. Not only is that DRNY's entire reason for existing and for being granted P&A status under the statute, but the statutes also contain built-in accountability mechanisms. Similar to many government officers, DRNY can be removed from its position by democratically accountable officials for certain types of "good cause." 42 U.S.C. § 15043(a)(4)(A). DRNY must report regularly to the federal government and the public on its

38

priorities, activities, accomplishments, and expenditures. *Id.* § 15043(a)(2)(C)–(D); *id.* § 10805(a)(7)–(8). DRNY must establish grievance procedures for constituents. *Id.* § 15043(a)(2)(E); *id.* § 10805(a)(9). And DRNY must establish governing bodies made up of members "who broadly represent or are knowledgeable about the needs of" its constituents. *Id.* § 15044(a)(1); *id.* § 10805(c)(1)(B). Through these and other provisions, "P&As are statutorily constructed to be responsive to the population[s] that they are charged with serving." Kelsey McCowan Heilman, Comment, *The Rights of Others: Protection and Advocacy Organizations' Associational Standing to Sue*, 157 U. Pa. L. Rev. 237, 264 (2008).

Second, DRNY is also given a financial stake in its litigation "on behalf of individuals with developmental disabilities," because while it may not use the monetary awards it wins for certain proscribed purposes, it is not prohibited from retaining those funds for other purposes. 42 U.S.C. § 15044(b)(1)–(2). This feature grants DRNY something like "a partial assignment" of its constituents' claims, *Vt. Agency*, 529 U.S. at 773, similar to the stake the government has when it sues for unpaid wages and can, in certain cases, retain some proceeds, 29 U.S.C. § 216(c).

Third, as discussed above, the statutes contain extensive findings, made and enacted into law by Congress, about why representational litigation by P&A

39

systems would better protect constituents' autonomy than available alternatives, including first-party litigation. Congress found, even though constituents of P&A systems and their families could in theory hire their own lawyers to vindicate their rights, that those mechanisms had historically been inadequate to the task.

True, DRNY's relationship to its constituents does not take exactly the same shape as that of a fiduciary, a "next friend," a traditional membership association, an assignee, or a government agency. And it may be that some of its constituents have more access to the courts than individuals traditionally represented by next friends and other representatives like guardians. But DRNY's theory of standing shares important attributes with each of those traditions, and standing doctrine does not require an exact match to one of a pre-set list of options.

When applying the "history and tradition" approach, which has been imported into standing doctrine by *TransUnion*, 594 U.S. at 424, we look for a "historical analogue," not a "historical twin," and we ask whether the modern regulation is consistent with the "principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 701. As discussed above, the principles we can derive from the history and tradition of representational standing are essentially those set out in the Supreme Court's recent cases elaborating the "personal stake"

40

requirement. Functionally, these statutes make DRNY loyal and accountable to its constituents and narrowly focused on serving those constituents. Those features ensure that DRNY is not simply "roam[ing] the country in search of governmental wrongdoing," *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge*, 454 U.S. at 487), and will present disputes "with the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Sprint*, 554 U.S. at 288. And, in light of Congress's extensive findings to the contrary, we have no basis to find that recognizing DRNY's standing will disserve "the 'autonomy' of those who are most directly affected." *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge*, 454 U.S. at 473).[7]

In sum, while we have an independent duty to ensure we have jurisdiction, we are ill-suited to second-guess Congress's conclusion that DRNY's constituents have been denied autonomy in the past, and that their autonomy is better served though representation by an organization purpose-built to advance their interests faithfully and protect their rights vigorously, including in federal court. Nothing

---

[7] In my view, as discussed in this section, DRNY derives its authorization to sue on behalf of its constituents, and its representational standing to do so, from Congress by statute. However, to the extent standing doctrine may also serve separation-of-powers values in part by protecting the prerogatives of the executive branch, it is worth noting (as the majority opinion does at 10) that the relevant regulations reinforce DRNY's authorization to "bring[] lawsuits in its own right to redress" injuries suffered by its constituents. 42 C.F.R. § 51.6(f); *cf. TransUnion*, 594 U.S. at 429 ("A regime where Congress could freely authorize unharmed plaintiffs to sue . . . also would infringe on the Executive Branch's Article II authority." (emphasis omitted)).

41

in Article III prohibits Congress from making that judgment, and the majority is wrong to substitute its views for those of the people's elected representatives.

*     *     *

For the foregoing reasons, while I join most of the majority opinion, I respectfully dissent from its decision that DRNY lacks Article III standing.